ZERELDA JAMES ET AL., Respondents. v. J. H. CHAMBERS, Appellant.

St. Louis Court of Appeals, June 9, 1885.

1. MARRIED WOMEN—CONTRACTS—A married woman may maintain an action, jointly with her husband, for personal services rendered by her, under contract.

2. CONTRACTS—FRAUD—PUBLIC POLICY.—Under an agreement to pay the plaintiff a royalty upon the sales of a book to which the plaintiff was to contribute facts, the publication by the defendant of a book which was a fraud upon the public and which contained a false and fraudulent statement purporting to come from the plaintiff, will not prevent the plaintiff's recovery for royalties accruing under the contract.

3. ——— WAIVER.—A public repudiation of the book by the plaintiff will not prevent a recovery, where the defendant has subsequently waived the breach committed by agreeing to continue under the old contract, in consideration of the plaintiff's retraction of the statements repudiating the book,

APPEAL from the St. Louis Circuit Court, BARCLAY, J.

*Affirmed.*

PATTISON & CRANE, for the appellant: A married woman can not make a contract. *Bauer v. Bauer*, 40 Mo. 61; *Higgins v. Peltzer*, 49 Mo. 152; *Musick v. Dodson*, 76 Mo. 624. A contract made by a married woman and another person can not be enforced by them jointly. *Dewey v. Cary*, 60 Mo. 224. "The repudiation of the contract by one of two joint obligees discharges the obligor." *Henry v. Mt. Pleasant Township*, 70 Mo. 500, 504. "Wherever two or more persons are engaged in a fraudulent transaction to injure another (or the public), neither law nor equity will interfere to relieve either of these persons as against the other from the consequences of their own misconduct." *Bolt v. Rogers*, 3 Paige 157; *Stockdale v. Onwhyn*, 7 Dowl. & R. 625; *Holman v. Johnson*, Cowp. 311.

J. F. MERRYMAN for the respondent; CHARLES P. JOHNSON, of counsel: Where a married woman is the *meritorious cause of action* she has the power to bind the party contracting with her. 1 Chitty Cont. 180, 257, 160; 1 Chitty Pl. 34; 1 Parsons Cont. 345; Rev. Stat., sect. 3296.

LEWIS, P. J., delivered the opinion of the court.

This action is founded on an agreement in writing in the following terms:

This article of agreement, made and entered into this twenty-fourth day of April, A. D. 1882, by and between J. H. Chambers & Company, the same being the firm name and style of a printing and publishing company of the city of St. Louis, county of St. Louis, and state of Missouri, party of the first part, and Mrs. Zerelda James, widow of the late Jesse James, deceased, of Kansas City, Jackson county, Missouri, and Zerelda Samuels, mother of the deceased, parties of the second part.

Witnesseth, That, for and in consideration of the covenants and agreement, hereinafter made, to be kept and performed by the parties of the second part hereto, the party of the first part hereby covenants and agrees to and with the said parties of the second part to print, publish, offer for sale, and sell a book, entitled "The Life, Times and Treacherous Death of Jesse James," and pay to said parties of the second part a royalty or percentage of five per cent. of the proceeds arising from the sale of said book, until the number of copies so published and sold shall have reached fifteen thousand (15,000), and ten per cent. upon all sales made after the same shall have reached said number of fifteen thousand. Further, that said book shall be issued in three (3) forms, viz.: one in pamphlet and paper cover, the retail price of which shall be one-half dollar for each and every one sold, the party of the first part, shall pay to the party of the second part two and one-half cents; one bound in cloth, the retail price of which shall be two dollars ($2), and for each and every one sold said party of the first part shall pay as aforesaid ten cents; and the third bound in leather, the retail price of which shall be two and one-half dollars ($2.50), and

the percentage so paid as aforesaid shall be twelve and one-half cents, for each and every one sold; that is, to say, that the party of the first part, hereby for itself, its heirs, executors, administrators, and assigns, agree, that it, said company, shall print, publish, bind, offer for sale, and sell, speedily, and according to its best ability, the book, entitled as aforesaid, compiled by Frank Triplett, and dictated by the parties of the second part, and pay to the parties of the second part by draft or otherwise, at the expense of the party of the first part, in per centum of all the proceeds arising from the sale of said book, at the retail price hereinbefore named, until such time when the number of copies sold (including the sum total of all kinds herein mentioned) shall reach fifteen thousand, when and thereafter such percentage paid as aforesaid, shall be ten per cent. (10 per cent.) upon the retail price as hereinbefore stated, said payments thereof to be made at the end of each and every month, by draft or remittance, to the said parties of the second part at Kansas City, Missouri, and at the same time furnish a full, true, and detailed statement of all books sold, and the kind thereof.

And the said party of the first part further agrees that if, at any time, it shall abandon or forfeit this contract, that the electrotype plates, and all the cuts and engravings, used in printing and publishing said book, shall become the sole and absolute property of the parties of the second part and be delivered to them without expense.

Also, that as soon as said book shall be issued, that it, said company, will give, free of charge, one hundred bound volumes thereof to the parties of the second part, as part of the consideration of this contract.

And the said parties of the second part hereto, for and in consideration of the covenants and agreements to be kept and performed on the part of the party of the first part, do covenant and agree with the party of the first part, that they will, to their utmost ability, aid in the editing and sale of said book, and give such assistance as their name and influence may add, and further that they will not, while this contract is in force, directly or indirectly, give or furnish any facts or statements for

publication, or other like purposes, connected with or regarding the subject matter of said book, except to the compiler, or for the revision of and for the book aforesaid.

It is mutually agreed by and between the parties hereto that each and every agreement herein contained shall apply to be in full force and effect in case of each and every edition and revision of said book, for and during the period of this contract, and binding upon the parties hereto and their legal representatives.

For the full, true, and faithful performance of this contract and agreements herein contained, the parties hereto have set their hands and fixed their seals the day and year above written.

J. H. CHAMBERS & Co.     [L. S.]

Signed in duplicate and witnessed by

R. J. HAIRE,                            [L. S.]

The petition is filed in the names of "Zerelda James, and Zerelda Samuels and Reuben Samuels, her husband," as plaintiffs. The verdict and judgment were in favor of the plaintiffs for $942.

The defendant contends that the present action is not maintainable because, on the face of the petition, the contract is void as having been made by a married woman. If the suit were against Mrs. Samuels, the objection might be fatal. But the logic which insists that when a contract is non-enforceable against one party, it must be necessarily void as to the other, finds a greater assurance in form than in fact—in sound, than in substance. Even the common law, while denying the responsibility of a *feme covert* on her attempted contract obligations, upholds the right of action in her and her husband against the other contracting party, in cases where she is the "meritorious cause of action." 1 Chitty Pl. 34; 1 Chitty Cont. 160, 257. 1 Parsons Cont. 345. Our statute, however, leaves nothing open to discussion on this point. Revised Statutes, section 3296 secures to "any married woman" her "rights in action * * * which may have come to her during coverture * * * by purchase with her separate money or means,

or be due as the wages of her separate labor, or have grown out of any violation of her personal rights, etc. ;" and section 3468 provides for the enforcement of such rights by suit instituted in the names of the husband and wife. The personal services, or "separate labor" of Mrs. Samuels constituted the consideration for the defendant's undertakings. She is, therefore, the "meritorious cause of action," and the suit is properly instituted in her behalf by herself and her husband. All the cases here cited for the defendant are those of suits against married women, and they have, therefore, no application to the present inquiry. A corresponding state of the law, with regard to suits by and against infants, on their personal contracts, is too familiar for elaborate comparison in illustration of the principle.

The testimony tended to show that the plaintiffs had furnished to the defendant, or his agent, all the facts demanded of them and within their personal knowledge, touching the life and doings of Jesse James ; that the book was published, and the defendant sold more than six thousand copies of it; that he paid to Mrs. James fifty dollars, and to Mrs. Samuels. twenty-five dollars, with twenty or twenty-five copies of the book, and that he paid nothing more to either of the plaintiffs, notwithstanding their demand, etc. It appeared from the evidence of the plaintiffs, that the facts furnished by them related exclusively to the domestic history and experiences of the subject of the memoir, together with some scenes of violence and disaster which Mrs. Samuels had witnessed, or of which she had been a victim. They told nothing whatever about any murders, robberies, or other crimes committed by the deceased son and husband, declaring that they knew nothing about them, if any such had ever existed, either of their own knowledge, or by information from Jesse James. The title page of the book announced that the volume gave "full particulars of each and every dark and desperate deed in the career of this most noted outlaw of any time or nation," and that "the facts and incidents contained in this volume were dictated to Frank Triplett by Mrs. Jesse

James, wife of the bandit, and Mrs. Zerelda Samuels, his mother." There was also published on an inner leaf of the cover a certificate, which appears in the right hand column below. Before the publication, a certificate was signed by the two ladies, and given to the defendant as it appears in the left hand column. The words in italics in the certificate as published were interpolated by the defendant, as the testimony tended to show, without the knowledge or consent of the plaintiffs.

ORIGINAL CERTIFICATE.

At Dr. Reuben Samuels',
        April 7, 1882.

" We, the undersigned Mrs. Zerelda Samuels, mother of Jesse James, and Mrs. Jesse James, certify that the work issued by J. H. Chambers, of St. Louis, is the only correct and authorized life of Jesse James. We have furnished the facts and know them to be authentic, said work written by Frank Triplett at our dictation.

        "(Signed)
"ZERELDA SAMUELS,
"MRS. JESSE JAMES."

CERTIFICATE AS PUBLISHED BY DEFENDANT, CHAMBERS.

Near Kearney, Mo.;
        April 7th.

We, the undersigned, Mrs. Zerelda Samuels, mother of Jesse W. James, and Mrs. Jesse James, *his wife, hereby* certify that the work *entitled " Life, Times and Treacherous Death of Jesse James* to be *published by* J. H. Chambers & Co., of St. Louis, is the only correct and authorized *edition of his life.* We have furnished the facts *from Jesse James' private memoranda, and from our own knowledge of the occurrences* and *we* know them to be authentic ; said work is *compiled* by Frank Triplett at our dictation.

(Fac simile signatures).
"ZERELDA SAMUELS,
"MRS. JESSE JAMES."

The broad gulf between the kind of information

given by the plaintiffs to the compiler, and the stories of "dark and desperate deeds," which fill the book, constitutes a defence here set up, that the whole enterprise was a deliberate fraud upon the public, and contrary to public policy; and that, therefore, there can be no recovery on the contract, which was the foundation of the fraud. But the fact appears to be overlooked that not a word or sign of any such fraudulent purposes is embodied in the contract, either expressly, or by the remotest implication. It is a well known rule that no instrument shall be construed to mean fraud, if its language will bear an interpretation of honest intent. The present contract, however, is so fair and straightforward in all its terms, as to need no aid from this rule. If there was any fraud or contravention of public policy, it began with the title page composed and published by the defendant, or his compiler. As this was after the making of the contract, and was not the act of the plaintiffs, it could not affect any right already vested in them by that instrument. Nor could the certificate of April 7 accomplish any thing more for the defendant's case. Triplett, the compiler, testified that "within a few days after the death of Jesse James, he went to see Mrs. Samuels and Mrs. James to get them to give their names and sanction to the life of Jesse James, which witness was to write for Chambers. Witness saw plaintiffs, and they told him that they would give him such facts as they could—such as they knew. But as to any robberies or crimes committed by Jesse, if he ever committed any, they knew nothing about them, and could not give him any facts in reference thereto." He further testified that, in the same interview, he "got them to sign the certificate of April 7, 1882;" and that the interpolations, which afterwards transformed it into the published certificate, were made "at the express dictation and request of the defendant." Did the plaintiffs, when they signed the original certificate, know that the book would contain, when published, anything at variance therewith—any facts other than those which

they were to furnish to the compiler? The record gives no explicit answer to this question, although a negative appears, to a certain extent, in Mrs. James's subsequent repudiation of the book and its contents. But, in any aspect of this inquiry, there can be no justification for assuming that the plaintiffs deliberately undertook to falsify in advance the origin and authenticity of narrations which they had never seen, and possibly might not anticipate. The real wrong was perpetrated when the defendant, with the book and its full contents before him, grossly exaggerated the terms of the certificate, and so gave it to the world, in palpable falsification of the facts. Here was an inexcusable fraud upon the plaintiffs, as well as upon the public. It was in evidence, and not disputed, that the plaintiffs gave to the compiler all the facts within their knowledge, and all the aid in their power for the due preparation of the work. Let it be conceded that, at the solicitation of the defendant's agent, and for the purpose of increasing the prospective sales of the book, the plaintiffs signed the certificate with a full consent, or a reckless indifference as to any use which the defendant might make of it in deceiving the public. This will still leave us unable to perceive how that fact should deprive them of all benefit of their separately made and independent contract, of the emoluments which they have fairly earned in accordance with its terms. A fair partnership agreement will be enforced between the partners, although in their business dealings they may habitually swindle their customers. There is no merit in the defence on this point.

Soon after the publication of the book, Mrs. James denounced and repudiated it in very emphatic terms, and published several cards declaring that it abounded in falsifications, that she would not be held responsible for them, and that she had never given any authority for the use of her name in connection with the publication issued by the defendant. But afterwards, on June 10, 1882, there was a consultation between Mrs. James and the defendant, the result whereof was a withdrawal of her opposition to the book, and of all the charges

she had made, with a new certificate endorsing, in effect, the defendant's use of her name, and recommending his work to the public acceptance. The defendant, on his part, agreed that he would "continue on under the old contract," and would thereafter render monthly statements of the number of books sold, with the amounts of royalty coming to the plaintiffs. The evidence in this connection was submitted to the jury in the light of the two following instructions:

"1 If the jury find from the evidence that on or about June 10, 1882, defendant informed Mrs. James, plaintiff, that if she would sign the card of that date, read in evidence, and would cease any opposition or objection to the book in question, or to its sale by defendant and his agent, the contract sued upon herein would be performed by defendant on his part, and the royalty therein mentioned be paid, and if the jury believe that she thereupon assented to said terms, and signed said card, and thereafter fully complied with the said terms so proposed, and that since said time plaintiffs made no objection or opposition to said book or to its sale by defendant or his agents, then the jury will find for plaintiffs for the amount of such royalty as they believe from the evidence is yet due and unpaid under the terms of the original contract of April 24, 1882, less any such sums as they may find from the evidence defendant is justly entitled to have deducted therefrom by reason of the facts set forth to the jury in instruction numbered two.

"2. If you believe that plaintiffs or either of them publicly repudiated the book published by defendant, or announced that it was unauthorized by them, or that it was untrue, or in any other way cast discredit on said book, or that plaintiffs, or either of them, caused the book to be so repudiated, or discredited, and you further believe that the sale of said book was thereby injured, decreased, or interfered with, and defendant suffered loss thereby, then you will deduct the amount of said loss from what you find defendant owes plaintiffs on the sale of said book, and if such loss should equal or exceed

what defendant owes plaintiffs, you will render a verdict for defendant."

We think that these instructions presented the respective rights of the parties fairly and correctly. The first is not, in our view, open to the defendant's objection that it introduces a new right of action, not contemplated in the pleadings. The jury are substantially informed of the legal effect of the defendant's agreement on June 10, as a waiver by him of any forfeiture previously incurred by Mrs. James, with respect to the contract. It was not essential that this legal effect should be set forth in apt and technical terms. It was sufficient for the jury to be told how they might practically consummate it in their verdict, if the facts justified. The jury were still informed that the recovery, if any, must be under the original contract.

With the concurrence of Judge Thompson, the judgment of the circuit court is affirmed. Judge Rombauer concurs in the result